IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-429

No. COA19-1054

Filed 17 August 2021

Cumberland County, No. 16 CVD 5260

MOMEN WALY, Plaintiff,

v.

SOHA ALKAMARY, Defendant.

Appeal by defendant from order entered 27 June 2019 by Judge Edward A. Pone in District Court, Cumberland County. Heard in the Court of Appeals 14 April 2020.

*Lewis, Deese, Nance & Ditmore, LLP, by Renny W. Deese, for plaintiff-appellee.*

*John M. Kirby, for defendant-appellant.*

STROUD, Chief Judge.

Mother appeals a permanent custody order granting primary custody of her daughter to Father. For the reasons discussed below, we hold the trial court had jurisdiction to enter the custody order under the Uniform Child Custody Jurisdiction and Enforcement Act. We also hold that where Mother did not file a proper motion for a stay of the North Carolina proceedings, and the trial court did not enter an order ruling on this issue, we have no jurisdiction to consider this argument. The trial court's order requiring the parties to communicate for purposes of coordination of

visitation and parenting through Our Family Wizard after Mother's sister was unavailable to serve as a go-between did not fail to give full faith and credit to the New Jersey domestic violence protective order. As Mother failed to authenticate the evidence she contends the trial court should have admitted, the trial court did not err in excluding the evidence. As the trial court's findings of fact were supported by the evidence, we affirm the trial court's order.

## I. Background

Mother and Father married in January 2013 and had one daughter, Sandy[1], in February of 2014. Father filed a complaint for child custody, child support, and attorney withdrawal in Cumberland County District Court on 19 July 2016. On 29 August 2016, Mother filed an answer and counterclaims for emergency custody, a restraining order, custody, child support, alimony, and attorney's fees. Mother alleged that she had traveled to New Jersey with Sandy on 4 June 2016 to visit family and was notified by Father one week later that he wanted to end their marriage. Thereafter, Mother and Sandy moved to New Jersey and Father relocated to Florida.

The trial court entered a temporary child support order directing Father to pay Mother $869.60 per month in child support on 14 October 2016 and a temporary child custody order on 18 October 2016. The parents were awarded joint legal custody with

---

[1] A pseudonym is used.

Mother having primary custody and Father having secondary physical custody by way of phased-in visitation. The order established the specific dates for Father's physical visitation with Sandy; granted Father Facetime/Skype/Webcam visitation every Tuesday, Thursday, and Sunday at 6:00 p.m.; and directed Mother and Father to exchange their respective addresses and phone numbers. The order also included a finding "[t]hat the parties should consider that since neither currently resides in Cumberland County, North Carolina: Cumberland County, North Carolina is no longer the most convenient forum for custody litigation."

¶ 4 The trial court entered an interim equitable distribution and postseparation support order on 23 November 2016. On 30 January 2017, Mother filed a motion for contempt alleging that Father violated both the temporary child support order and the interim equitable distribution and postseparation support order.

¶ 5 On 23 February 2017, Father posted on Facebook: "Nothing is ever forgotten, nothing is ever forgiven. Everything will be remembered, everything will be avenged." In response, Mother filed for a temporary restraining order in New Jersey and advised the New Jersey court of the pending custody case in North Carolina and the temporary custody order. On 11 April 2017, the New Jersey trial court entered a final restraining order ("DVPO") barring Father "from having <u>any</u> oral, written, personal, electronic, or other form of contact or communication with:" Mother. Under the DVPO, Father's visitation with Sandy remained "as scheduled in North Carolina

order" with the additional requirements that Father coordinate Facetime visitation with Mother's sister, and the parties exchange Sandy at the New Bridge Police Department.

¶ 6        On 20 July 2017, Father filed a motion for contempt alleging that Mother refused to allow him visitation and Facetime access with Sandy. Father filed an amended motion for contempt on 1 August 2017 and included an additional allegation that Mother refused to provide Father with the phone number and address of her new residence. On 15 August 2017, Mother filed motions for emergency relief, contempt, and attorney's fees.

¶ 7        On 21 December 2017, the trial court entered a holiday visitation order, which awarded Father visitation with Sandy from 21 December to 23 December 2017. The holiday visitation order referenced the DVPO's minor modifications to Father's visitation and found that "[o]therwise, the New Jersey court deferred the terms of [Father's] visitation to this court and the prior order entered by this court." On 26 December 2017, Father filed a motion for contempt, which alleged that Mother's refusal to allow him visitation with Sandy, coupled with her failure to provide her sister's contact information, violated the holiday visitation order. Father also alleged that, in contravention of prior orders, Mother had relocated and refused to provide Father with the address or phone number.

¶ 8        Around 8 January 2018,[2] Mother filed a verified complaint for divorce in New Jersey seeking divorce, alimony, child support, child custody, equitable distribution, and attorney's fees.  The complaint included the allegations required by the Uniform Child Custody Jurisdiction and Enforcement Act—respectively North Carolina General Statute § 50A-209 ("Information to be submitted to court") and New Jersey Statute Annotated § 2A:34-73(a)(1) (same)—regarding other proceedings between the parties:

> There have been no previous proceedings between [Mother] and [Father] respecting the marriage or its dissolution or respecting the division of property of the parties in any Court except FV-12-1444-17 in connection with a Final Restraining Order issued by this Court in favor of [Mother] against [Father], A-4086-16 in connection with [Father's] appeal of the Final Restraining Order, and File # 16CVD5260 in Cumberland County District Court, NC.

Specifically, Mother requested "[j]udgment against [Father]" on the various claims, including: "[f]or child support;" "[f]or custody of the unemancipated child;" and "[r]egistering and/or granting full faith and credit to the Orders entered in North Carolina[.]"

¶ 9        Mother mailed a letter dated 12 January 2018 to the Cumberland County District Court Clerk's Office entitled "motion to stay North Carolina proceeding."  In

---

[2] The complaint in the record does not have a file stamp and does not indicate the date it was signed.  We glean 8 January 2018 from subsequent testimony.

the letter, Mother explained that she had filed a divorce action in New Jersey and "[a]s a single mom, it's been a financial burden on [her] to still have an attorney in North Carolina, and for the added cost of travel to North Carolina to represent [herself] in court." She asked for the trial court to "please accommodate [her] request to stop all proceedings in North Carolina." The letter was not file-stamped but according to the transcript, Mother handed it to the trial court. There is no indication the letter was served upon Father's counsel until it was discussed during the hearing on 5 March 2018.

¶ 10 On 5 March 2018, the trial court held a hearing on child custody, child support, and contempt. The trial court engaged in an extensive discussion with the parties regarding the issue of jurisdiction, Mother's "motion to stay" letter, and Mother's New Jersey divorce complaint. The trial court stated, "I'm not staying anything here" and [a]s far as I'm concerned, North Carolina law is the law until I say it[']s not or until I talk to a judge up there and we determine what to do." The trial court told Mother to give Father her sister's contact information and to have her attorney in New Jersey contact Father's attorney.

¶ 11 On 14 November 2018, Mother filed her second complaint in New Jersey seeking divorce, child support, back child support, alimony, and custody. The second New Jersey complaint was filed *pro se* on a form complaint entitled "Form 1D: Complaint for Divorce/Dissolution Based on Irreconcilable Differences." Paragraph

11 of the form instructed: "List any other court cases where you or your spouse/civil union partner are plaintiffs or defendants, such as cases for adoption, bankruptcy, personal injury, child support, custody, domestic violence, etc."  Mother listed only "Final restraining order A-4086-16I1," referring to the New Jersey DVPO.  She also certified that "[t]he matter in controversy in the within action is not the subject of any other action pending in any court or of a pending arbitration proceeding, nor is any such court action or arbitration proceeding presently contemplated."

¶ 12        On 7 January 2019, Father filed a motion for contempt and a motion for modification of custody.  Father alleged that Mother failed to produce verification of her monthly expenses and Sandy's medical records, in violation of a prior order, and alleged a substantial change in circumstances mandated an emergency order awarding Father primary custody of Sandy.  Father alleged that Mother neglected Sandy, interfered with Father's relationship with Sandy, failed to obtain necessary medical care for Sandy, was not stable, and was unable to provide for Sandy's needs.

¶ 13        On 5 March 2019, the New Jersey trial court entered an amended DVPO on remand from the appellate division reflecting "that the sole predicate act of domestic violence serving as the basis for the final restraining order . . . is harassment[.]" (Original in all caps.)  The no-contact provision in the amended DVPO remained unchanged from the original DVPO.  Specifically, the Amended DVPO included the following provision regarding "Parenting time (visitation)": "Parenting will be the

same as scheduled in North Carolina order. Pick up/drop off at Old Bridge PD. [Father] to text [Mother's] sister (Sally Alkamary) regarding parenting time only. CS shall be as per North Carolina order." (Original in all caps.) Based upon the record before this Court, the New Jersey court did not change any of the provisions of the DVPO relevant to visitation, did not contact the trial court in North Carolina, and did not make any indication of any proceeding or issue regarding child custody pending in the New Jersey court.

¶ 14        On 11 and 12 March 2019, the trial court held a hearing on termination of post separation support, alimony, and equitable distribution. The trial court entered an order on 9 May 2019. Mother and Father stipulated to the terms of equitable distribution, termination of postseparation support, and dismissal of Mother's alimony claim. Father was awarded Facetime visitation with Sandy on Monday, Wednesday, and Friday between 7:30 and 8:30 p.m. and physical visitation with her 13-14 March 2019 and 16-22 April 2019. The trial court continued the custody hearing until 14 May 2019, finding that "North Carolina has continuing jurisdiction of the custody matters and has instructed the parties to file the necessary motions in New Jersey to clarify the New Jersey [DVPO] and to ensure that the parties are allowed contact only as it relates to the health and welfare of the minor child." As a result, in order "to have clarification with regard to the provisions of the New Jersey [DVPO] which prohibit any contact between these parties[,]" the trial court postponed

entering judgment on custody until 14 May 2019.

¶ 15        Following the 14 May 2019 hearing on custody, the trial court entered an order on 14 June 2019. The trial court found that on 11 and 12 March 2019 it had heard evidence regarding custody and had given "to the parties specific instructions to file the necessary motions in New Jersey to clarify the New Jersey order and to ensure that the parties are allowed contact only as it relates to the health and welfare of the minor child." Despite these instructions, however, the trial court found that "there has been no hearing or subsequent New Jersey order to address" the provisions of the New Jersey Amended DVPO, which prevent Father from any contact with Mother. The court noted its concern that Mother "may and can legally use the provisions of the protective order from New Jersey that she sought and obtained to legally shield [Father] from contact with the minor child and to further alienate the child from [Father]." The trial court also found that it received information that Mother's sister no longer wanted to facilitate Father's visitation with Sandy. The court ordered Mother and Father to appear before the court on 24 June 2019 for entry of judgment and directed Mother to bring Sandy to Cumberland County on that date "so that the child can be in the care of [Father] for an extended visitation[.]"

¶ 16        Following the 24 June 2019 hearing, the trial court entered a permanent custody order. The trial court concluded it was in Sandy's best interest that Father have primary physical custody and Mother have secondary custody in the form of

visitation. In regard to the DVPO, the trial court found that it was in Sandy's best interest "for the parties to have contact for the purpose of facilitating visitation and to discuss the welfare of the minor child." (Original underlined.) Mother appeals.

## II. Motion to Dismiss

On 30 January 2020, Father filed a motion to dismiss Mother's appeal for alleged violations of North Carolina Appellate Rules 7(a)(1) and 28(b)(6). Father argues that Mother's brief "fails to properly cite in the Record the findings or conclusions the trial court made allegedly unsupported by the evidence in violation of Rule 7(a)(1)" and "fails to state a Standard of Review for each issue presented (except the first issue presented) in violation of Rule 28(b)(6)."

As an initial matter, we note North Carolina Appellate Rule 7(a)(1)[3] was deleted in 2017. As a result, Mother could not have violated this rule. *See generally* N.C. R. App. P. 7(a)(1) (2015). As to Father's second argument, North Carolina Appellate Rule 28(b)(6) provides in pertinent part:

> The argument shall contain a concise statement of the applicable standard(s) of review for each issue, which shall appear either at the beginning of the discussion of each issue or under a separate heading placed before the beginning of the discussion of all the issues.

---

[3] Prior to its deletion, Appellate Rule 7(a)(1) stated, "[i]f the appellant intends to urge on appeal that a finding or conclusion of the trial court is unsupported by the evidence or is contrary to the evidence, the appellant shall cite in the record on appeal the volume number, page number, and line number of all evidence relevant to such finding or conclusion." N.C. R. App. P. 7(a)(1) (2015).

The body of the argument and the statement of applicable standard(s) of review shall contain citations of the authorities upon which the appellant relies. Evidence or other proceedings material to the issue may be narrated or quoted in the body of the argument, with appropriate reference to the record on appeal, the transcript of proceedings, or exhibits.

N.C. R. App. P. 28(b)(6). Mother's brief contains a "standard of review" section containing the applicable standard of review for some, but not all, of the issues she advances before this Court. Although "[v]iolation of [Rule 28(b)(6)] may result in dismissal[,]" *State v. Parker*, 187 N.C. App. 131, 135, 653 S.E.2d 6, 8 (2007) (citation omitted), "[w]e also note that our Rules of Appellate Procedure allow for the imposition of less drastic sanctions," *Id.* (citation omitted). Any alleged violations do not impair this Court's ability to review Mother's arguments, so "[i]n this instance, we elect not to take any action." *Wilson v. Pershing, LLC*, 253 N.C. App. 643, 649, 801 S.E.2d 150, 155 (2017).

## III. UCCJEA

Mother argues that the trial court "lost jurisdiction because the parents and the child relocated out of North Carolina." (Original in all caps.) Alternatively, Mother contends that the trial court should have stayed the proceedings in North Carolina and never proceeded to the custody trial and permanent custody award.

The Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") has been codified in North Carolina under Chapter 50A of the North Carolina General

Statutes. It "provides a uniform set of jurisdictional rules and guidelines for the national and international enforcement of child-custody orders." *Hamdan v. Freitekh*, 271 N.C. App. 383, 386, 844 S.E.2d 338, 341 (2020) (citation omitted). The "Official Comment"[4] to North Carolina General Statute § 50A-101 identifies the purposes of the UCCJEA:

> (1) Avoid jurisdictional competition and conflict with courts of other States in matters of child custody which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being;
>
> (2) Promote cooperation with the courts of other States to the end that a custody decree is rendered in that State which can best decide the case in the interest of the child;
>
> (3) Discourage the use of the interstate system for continuing controversies over child custody;
>
> (4) Deter abductions of children;
>
> (5) Avoid relitigation of custody decisions of other States in this State;
>
> (6) Facilitate the enforcement of custody decrees of other States;

Official Comment to N.C. Gen. Stat. § 50A-101 (2019).

## A. Initial Child Custody Determination

---

[4] "This Court has noted that the commentary to a statutory provision can be helpful in some cases in discerning legislative intent." *Parsons v. Jefferson-Pilot Corp.*, 333 N.C. 420, 425, 426 S.E.2d 685, 689 (1993).

¶ 21        Mother argues that the trial court did not have jurisdiction under the UCCJEA

to enter the permanent custody order because after the filing of the action and entry

of the first temporary custody order, she moved to New Jersey and Father moved to

Florida.

¶ 22        "Whether the trial court has jurisdiction under the UCCJEA is a question of

law subject to *de novo* review." *In re J.H.*, 244 N.C. App. 255, 260, 780 S.E.2d 228,

233 (2015) (citation omitted).  North Carolina General Statute § 50A-201, which

addresses jurisdiction for initial child custody determinations, provides in pertinent

part:

> (a) Except as otherwise provided in G.S. 50A-204, a court
> of this State has jurisdiction to make an *initial child-
> custody determination* only if:
>
> > (1) *This State is the home state of the child on the
> > date of the commencement of the proceeding, or was
> > the home state of the child within six months before
> > the commencement of the proceeding, and the child is
> > absent from this State but a parent or person acting
> > as a parent continues to live in this State*[.]

N.C. Gen. Stat. § 50A-201 (emphasis added).

¶ 23        The UCCJEA defines "'[h]ome state'" as "the state in which a child lived with

a parent or a person acting as a parent for at least six consecutive months

immediately before the commencement of a child-custody proceeding."  N.C. Gen.

Stat. § 50A-102(7).  "'Initial determination'" is defined as "the first child-custody

determination concerning a particular child." N.C. Gen. Stat. § 50A-102(8). "'Child-custody determination'" is defined as "a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, and modification order." N.C. Gen. Stat. § 50A-102(3). "'Child-custody proceeding'" is defined as "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue." N.C. Gen. Stat. § 50A-102(4). "'Commencement'" is defined as "the filing of the first pleading in a proceeding." N.C. Gen. Stat. § 50A-102(5).

¶ 24   Here, the "commencement" of the proceeding was the filing of Father's complaint for child custody in Cumberland County on 19 July 2016. Mother then filed counterclaims, including a custody claim, in the Cumberland County action. At the "commencement" of this "child custody proceeding," North Carolina was clearly the "home state" of the child, as the child had resided in North Carolina for more than six months. N.C. Gen. Stat. § 50A-102 (4), (5), and (7). Mother does not dispute that North Carolina was the home state at the commencement of the proceedings; she contends the trial court "lost jurisdiction after it issued the temporary custody order and all of the parties permanently left the State for more than six months."

¶ 25   However, "[o]nce jurisdiction of the [trial] court attaches to a child custody matter, it exists for all time until the cause is fully and completely determined." *In re Baby Boy Scearce*, 81 N.C. App. 531, 538-39, 345 S.E.2d 404, 409 (1986) (citations

omitted). Here, the custody action was commenced in North Carolina. Even though Father, Mother, and child all moved out of the state shortly after the initiation of the suit, under the circumstances of this case North Carolina retained its jurisdiction under the UCCJEA until the conclusion of the custody matter. *See id.* This continuity promotes the UCCJEA's purpose of "[a]void[ing] jurisdictional competition and conflict with courts of other States[.]" Official Comment to N.C. Gen. Stat. § 50A-101.

¶ 26     Contending that the "Permanent Custody Order was a modification of the temporary custody order[,]" Mother argues "[t]he controlling North Carolina statute is G.S. § 50A-202[.]" North Carolina General Statute § 50A-202, which addresses "[e]xclusive, continuing jurisdiction[,]" states:

> (a) Except as otherwise provided in G.S. 50A-204, a court of this State which has made a child-custody determination consistent with G.S. 50A-201 or G.S. 50A-203 has exclusive, continuing jurisdiction over the determination until:
>> (1) A court of this State determines that neither the child, the child's parents, and any person acting as a parent do not have a significant connection with this State and that substantial evidence is no longer available in this State concerning the child's care, protection, training, and personal relationships; or
>>
>> (2) A court of this State or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this State.

(b) A court of this State which has made a child-custody determination and does not have exclusive, continuing jurisdiction under this section may modify that determination only if it has jurisdiction to make an initial determination under G.S. 50A-201.

N.C. Gen. Stat. § 50A-202. North Carolina General Statute § 50A-203, which governs "[j]urisdiction to modify determination," provides:

Except as otherwise provided in G.S. 50A-204, a court of this *State may not modify a child-custody determination made by a court of another state* unless a court of this State has jurisdiction to make an initial determination under G.S. 50A-201(a)(1) or G.S. 50A-201(a)(2) and:

(1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under G.S. 50A-202 or that a court of this State would be a more convenient forum under G.S. 50A-207; or

(2) A court of this State or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

N.C. Gen. Stat. § 50A-203 (emphasis added). The Official Commentary to North Carolina General Statute § 50A-203 explains that Section 203 "complements Section 202 and is addressed to the court that is confronted with a proceeding to modify a custody determination of another State." Thus, North Carolina General Statutes §§ 50A-202 and 50A-203 apply to "modification" jurisdiction, whereas North Carolina General Statute § 50A-201 applies to "initial determination" jurisdiction. In this case, the trial court was not exercising modification jurisdiction because it was not

considering modifying "a child-custody determination *made by a court of another state[.]*" N.C. Gen. Stat. § 50A-203 (emphasis added). After Father's commencement of the custody action in the trial court, North Carolina retained its "initial determination" jurisdiction. Because North Carolina was the "home state" of Sandy for more than six months before Father filed the custody action in Cumberland County, North Carolina had jurisdiction to enter the permanent custody order, and North Carolina General Statute § 50A-202 is not the "controlling statute" under these facts.

¶ 27    Mother contends that New Jersey had jurisdiction simply because she and the Sandy had moved to North Carolina and Father had moved to Florida. But based upon the record before this Court, Mother apparently never attempted to have the New Jersey court exercise jurisdiction over custody, despite the trial court's efforts encouraging the parties to consider if New Jersey may be a more appropriate forum for the case and continuing the custody hearing to give Mother time to address the issue in New Jersey. Mother did obtain a DVPO in New Jersey, and the provisions of the DVPO and Amended DVPO addressed communication and contact between Mother and Father for purposes of visitation, but as the trial court noted, New Jersey had deferred to the North Carolina court as to the custody determination, specifically noting in both orders, "Parenting will be the same as scheduled in North Carolina order." (Original in all caps.) We also note that Mother had filed separate actions in

New Jersey including claims for child custody, but the action filed in 2018 was dismissed. The action Mother filed *pro se* in 2019 did not comply with the UCCJEA as it did not identify the North Carolina child custody proceeding as required by New Jersey Statutory Annotated § 2A:34-73(a)(1). *See* N.J. Stat. Ann. § 2A:34-73(a)(1) (West 2019) ("[The pleading or affidavit shall state whether the party] has participated, as a party or witness or in any other capacity, in any other proceeding concerning the custody of or visitation with the child and, if so, identify the court, the case number of the proceeding, and the date of the child custody determination, if any[.]").

¶ 28 If Mother had taken the appropriate actions and filed the appropriate motions or pleadings, it is possible that North Carolina may have declined to exercise jurisdiction on the basis of an "inconvenient forum" determination pursuant to North Carolina General Statute § 50A-207. But, as discussed below, the trial court declined to make such a determination at the 5 March 2018 hearing.

**B. Stay of Custody Proceedings**

¶ 29 Alternatively, Mother argues that the trial court "should have stayed custody proceedings due to convenience to the parties and witnesses." (Original in all caps.) Specifically, Mother contends because the trial court "determined as of 14 October 2016 that 'North Carolina is no longer be [sic] most convenient forum for custody litigation[,]' . . . even if North Carolina had jurisdiction, the [trial court] should have

stayed the action in March 2018 on [Mother's] motion, and should not have proceeded to a custody trial and custody award in 2019."

Here, at the 5 March 2018 hearing, the trial court engaged in an extensive discussion with Father's counsel, Ms. Hatley, and Mother regarding jurisdiction and Mother's request to stay the North Carolina proceedings:

> THE COURT: He lives in Florida and she lives in New Jersey?
>
> MS. HATELY: That's correct.
>
> THE COURT: Why are we here?
>
> MS. HATLEY: Because the -- this Court had jurisdiction –
>
> . . . .
>
> MS. HATLEY: --at the time of the filing, Your Honor and
>
> THE COURT: And then everybody moved
>
> MS. HATLEY: That's correct. And we only have temporary orders, which are not being complied with. So at this point, you have jurisdiction.

Mother explained that she had a DVPO against Father from New Jersey and that she had counsel in New Jersey, but not North Carolina. As to the complaint Mother filed in New Jersey for divorce, equitable distribution, child support, and child custody, Ms. Hatley explained:

> I'm aware of the restraining order. That is up on appeal. I'm aware that she's filed for divorce in New Jersey as well

as overseas in their home of origin, the country of origin that these parties are from. So there are attorneys that have been involved in those cases, but no other state has assumed jurisdiction of the custody, and no other state has assumed jurisdiction of any of these spousal support or property issues.

The court then addressed the letter Mother sent to the trial court entitled "motion to stay."

> THE COURT: And you've not had any contact from this attorney in New Jersey?
>
> MS. HATLEY: No, Your Honor. No one has given me a single call. Nor has there been a proper motion to -- to release jurisdiction on the transfer (inaudible) this court.
>
> THE COURT*: It's not in the file, but there is – there's something here that she has written that she just handed up entitled a Motion to Stay (inaudible) proceeding dated January 12 of 2018.*
>
> [MOTHER]: I am -- have a copy, yeah, in here.
>
> MS. HATLEY: Your Honor, I'm not sure a Motion to Stay is the appropriate motion.
>
> [MOTHER]: Yeah. I am here copy. I need to have copy, yeah. I am a copy of -- I (inaudible) a copy from Stay of Motion prepared on the court. I have (inaudible).
>
> THE COURT*: Let Ms. Hatley see those and then hand those back to her*. Well, you probably want to tell them to tell your lawyer that everything is pending down here and that this one was filed first. So when the judge up there talks to me, this is the court where it's going to happen. And your lawyer needs to get in touch with Ms. Hatley. Because it just doesn't happen like this. And I'm concerned about

some of the things that are in here, particularly (inaudible) that there have been no previous proceedings between plaintiff and defendant respecting the marriage dissolution or respecting the division of property of the parties in any court except as was entered in the restraining order, which is not exactly accurate because this case has been pending for quite a while. So they should have known about this. And they requested relief for alimony, support, custody, equitable distribution. And as I look at my docket, I have custody, support, ED all here. So North Carolina at this point is the appropriate place for this to happen because this is where it was instituted. Now, as I read -- this was granted in the order also, if the Court to grant custody to her, (inaudible) to us on what to do thereafter.

MS. HATLEY: Your Honor, if it's like our 50(b) and 50(a), I would -- I would argue to the Court that 50(a) controls and the custody order of this court would control.

THE COURT: As far as I'm concerned, North Carolina law is the law until I say it's not or until I talk to a judge up there and we determine what to do. Okay.

. . . .

THE COURT: I'm concerned more about the restraining -- the restraining order is their issue. Apparently he went up there and submitted to the jurisdiction, so that is what it is. But the custody and all these other issues are still proper over here, at least for the present time. Hand those back to her, please. Yeah, Ms. Hatley, there is a – what's -- what is denominated as a Motion to Stay, filed January 18th. It's all in here.

MS. HATLEY: Was that signed by her or was that signed by the New Jersey attorney, Your Honor?

THE COURT: I think -- it appears that she mailed it. She has her tracking number there and that apparently came

to the clerk and it was placed in the file.

MS. HATLEY: Because I know we would have to be heard on the motion to stay and ask that that be denied at this point.

THE COURT: I'm not staying anything in here.

MS. HATLEY: Wonderful.

THE COURT: I can tell you that right now. I'm not doing that. I'm not – I'm not saying it won't subsequently be released to New Jersey. I'd have to talk to a judge up there and see exactly what they've done. They're probably about like us, so. . . Well, I did hear you at one point say you were going to get an attorney for down here now again. When do you intend to do that?

[MOTHER]: I am -- I haven't done it because I have -- I don't have money to attorney here and I –

THE COURT: Well, let me start by saying you probably want to talk to your lawyer up there and let them know to get in touch with Ms. Hatley forthwith, that means right away, so that – you've got a lawyer –

[MOTHER]: Okay.

THE COURT: -- up there.

[MOTHER]: Yes.

THE COURT: This case started down here.

[MOTHER]: Yes.

THE COURT: And we are here. I have not relinquished jurisdiction in the case. North Carolina still has control. Also tell your lawyer that if he does not get in touch with

> Ms. Hatley very, very soon, this Court may be issuing additional orders.
>
> [MOTHER]: Okay.
>
> THE COURT: Okay. All right. *And your court has already deferred to us in terms of the visitation and all of that*, so -- while you all sort out the restraining order.

(Emphasis added.)

¶ 31 Mother contends the trial court should have treated her letter as a formal motion for stay under North Carolina General Statute § 50A-207 and that the trial court erred by not granting a stay based on North Carolina being an inconvenient forum. "The decision to relinquish jurisdiction to another state on the basis of more convenient forum is reviewed for an abuse of discretion." *In re M.M.*, 230 N.C. App. 225, 228, 750 S.E.2d 50, 52-53 (2013) (citation omitted). North Carolina General Statute § 50A-207 provides:

> (a) A court of this State which has jurisdiction under this Article to make a child-custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances, and that a court of another state is a more appropriate forum. The issue of inconvenient forum may be raised upon motion of a party, the court's own motion, or request of another court.
>
> (b) Before determining whether it is an inconvenient forum, a court of this State shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all

relevant factors, including:

> (1) Whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;
>
> (2) The length of time the child has resided outside this State;
>
> (3) The distance between the court in this State and the court in the state that would assume jurisdiction;
>
> (4) The relative financial circumstances of the parties;
>
> (5) Any agreement of the parties as to which state should assume jurisdiction;
>
> (6) The nature and location of the evidence required to resolve the pending litigation, including testimony of the child;
>
> (7) The ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and
>
> (8) The familiarity of the court of each state with the facts and issues in the pending litigation.

(c) If a court of this State determines that it is an inconvenient forum and that a court of another state is a more appropriate forum, *it shall stay the proceedings upon condition that a child-custody proceeding be promptly commenced in another designated state and may impose any other condition the court considers just and proper*.

(d) A court of this State may decline to exercise its jurisdiction under this Article if a child-custody

determination is incidental to an action for divorce or another proceeding while still retaining jurisdiction over the divorce or other proceeding.

N.C. Gen. Stat. § 50A-207 (emphasis added).

¶ 32     Here, Mother did not file a motion requesting a stay, but the trial court addressed her letter at the hearing. The trial court, however, did not memorialize its oral ruling that "I'm not staying anything here" in a written order. In North Carolina, "a judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court," N.C. Gen. Stat. § 1A-1, Rule 58 (2019), and "[t]he entry of judgment is the event which vests this Court with jurisdiction[,]" *Worsham v. Richbourg's Sales & Rentals, Inc.*, 124 N.C. App. 782, 784, 478 S.E.2d 649, 650 (1996) (citation omitted). Thus, even if we were to assume Mother's letter could be considered as a proper motion to stay proceedings pursuant to Rule 7(b) of the North Carolina Rules of Civil Procedure, because the trial court never entered an order ruling Mother's "motion to stay" letter, this Court does not have jurisdiction to determine whether the trial court abused its discretion by not granting a stay. *See id.*

¶ 33     Rule 7(b) of the North Carolina Rules of Civil Procedure provides:

> (1) An application to the court for an order shall be by motion which, unless made during a hearing or trial or at a session at which a cause is on the calendar for that session, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth

> the relief or order sought. The requirement of writing
> is fulfilled if the motion is stated in a written notice of
> the hearing of the motion.
>
> (2) The rules applicable to captions, signing, and other
> matters of form of pleadings apply to all motions and
> other papers provided for by these rules.

N.C. Gen. Stat. § 1A-1, Rule 7(b) (2019). At the hearing, the trial court indicated that

Mother's letter was "filed January 18th" and "it appears that she mailed it," explaining

"[s]he has her tracking number there and that apparently came to the clerk and it

was placed in the file." The letter was not filed stamped or served on Father's counsel

prior to the hearing, nor did it identify any legal basis for the trial court to stay its

proceedings. Thus, Mother's purported motion did not comply with the Rules of Civil

Procedure.

¶ 34     As the trial court did not enter an order ruling upon Mother's purported

motion, we have no jurisdiction to consider Mother's argument. However, we

appreciate the trial court's efforts to address Mother's contentions, even in the

absence of a motion. The trial court engaged in an extensive discussion regarding its

jurisdiction and did not rule out the prospect that jurisdiction could be transferred to

New Jersey in the future stating, "I'm not saying it won't subsequently be released to

New Jersey. I'd have to talk to a judge up there and see exactly what they've done."

The trial court explained its concern that Mother, in her divorce action in New Jersey,

certified

> there have been no previous proceedings between plaintiff and defendant respecting the marriage dissolution or respecting the division of property of the parties in any court except as was entered in the restraining order, which is not exactly accurate because this case has been pending for quite a while. So they should know about this. And they requested relief for alimony, support, custody, equitable distribution. And as I look at my docket, I have custody, support, ED all here.

¶ 35      The trial court's statements reflect its consideration of certain factors enumerated in North Carolina General Statute § 50A-207(b), including: "[t]he nature and location of the evidence required to resolve the pending litigation, including testimony of the child;" "[t]he ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence;" and "[t]he familiarity of the court of each state with the facts and issues in the pending litigation." N.C. Gen. Stat. § 50A-207(b)(6)-(8). The trial court also discussed and allowed Mother to present evidence as to "[w]hether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child" and "[t]he relative financial circumstances of the parties[.]" N.C. Gen. Stat. § 50A-207(b)(1), (4). Indeed, Mother was given specific directions on what actions to take for the trial court to consider making a determination that North Carolina was an inconvenient forum and transferring jurisdiction to New Jersey.

### IV.    Compliance with Visitation Order

¶ 36      Mother argues that the trial court "erred in finding that [she] had not complied

with visitation orders and had frustrated internet and phone visitation." (Original in all caps.) She contends that the trial court's order "fails to provide a factual basis for a finding that the mother did not comply with visitation orders, or that she failed to foster a relationship between the child and father; and these findings are contrary to the evidence regarding visitation."

> In a child custody case, the trial court's findings of fact are conclusive on appeal if supported by substantial evidence, even if there is sufficient evidence to support contrary findings. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Unchallenged findings of fact are binding on appeal. The trial court's conclusions of law must be supported by adequate findings of fact. . . . Absent an abuse of discretion, the trial court's decision in matters of child custody should not be upset on appeal.

*Peters v. Pennington*, 210 N.C. App. 1, 12-13, 707 S.E.2d 724, 733 (2011) (citations and quotation marks omitted).

¶ 37    Mother challenges the following findings of fact:

> 42. Since the date of separation she has not fostered a relationship and has willfully withheld visitation.
>
> 43. She has not made any genuine efforts to foster that relationship and there is a substantial likelihood that this may continue into the foreseeable future.
>
> . . . .
>
> 45. [Mother] has made numerous efforts to circumvent and violate this court's orders as to visitation with [Father] and to otherwise delay the matter.

46. She has resisted allowing the father to visit and to otherwise have contact with the minor child.

47. She has used the New Jersey DVPO as a means of avoiding the father having any contact with her and relegating his efforts to exercise his visitation contingent upon his contact with relatives of the mother.

. . . .

50. It is clear to this court she does not intend to foster a relationship with [Father] and to award her primary custody would likely result in constant and continuous violations and further alienating the Plaintiff father from the minor child.

. . . .

59. She was ordered by the Court in December 6, 2016, to allow Christmas visitation in December, 2017 beginning December 21, 2017, and she willfully failed to do so.

60. The Father was authorized to have facetime, skype and other telephonic communication with the minor child and the mother willfully refused to comply.

. . . .

62. She offered excuses which were not valid and continued to not comply resulting in numerous contempt motions being filed and more requests at preliminary hearings.

. . . .

64. [Father] has had to come to court each time to enforce compliance and to get additional visitation. She has repeatedly refused to comply with the orders.

Mother contends the challenged findings of fact are "repetitive, conclusory, and generalized" and without "specific factual context[.]" Mother asserts that "[l]ooking at the actual evidence regarding visitation, the record shows that the [Father] had full physical visitation with the child in conformity with the temporary custody orders, with two exceptions."

¶ 38     The record evidence supports the trial court's findings of fact regarding Father's visitation. At the 11 March 2019 hearing, Father testified that from June of 2016 to March of 2017, Mother "wo[uldn't] let [him] speak to [his] daughter." After he "unsuccessfully tried several times to speak to [his] daughter, [he] hired an attorney in North Carolina and [he] attempted to get a court order to go see [his] daughter." After detailing the specific instances when Mother refused to allow him the visitation ordered by the trial court, Father explained that "25 percent of the time [he] was successful to see [his] daughter" and "[t]he other 75 percent [Mother] refused." According to Father, the trial court's directive that he communicate with Sandy via Skype three days a week at 6:00 p.m. "has been fulfilled 50 percent of the time" and during those times, Sandy was located at the mall or park and "doesn't want to pay attention to talk to [him,]" which Father believed Mother was doing intentionally "so to limit [his] interaction with [his daughter] on purpose." He testified about the difficulties arising from Mother's sister's facilitation of Skype visitation and noted that "the bottom line is every single visitation there is

harassment of some sort" and "[e]very single visitation" he "had to get a court order, because otherwise [he didn't think [he] would be able to." Moreover, in a finding of fact not challenged by Mother, the trial court found that "[t]he New Jersey Appellate Court noted that the trial court chastised the mother for not complying with this Court's custody order. He admonished her that it was wrong to interfere with the father's visitation time." *See Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." (citations omitted)).

¶ 39        Mother's assertion that she had fully complied with the visitation orders with the exception of two occasions goes to the trial court's assessment of the weight and credibility of the evidence, which is in the purview of the trial court:

> A trial judge passes upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom. . . . It is clear beyond the need for multiple citation that the trial judge, sitting without a jury, has discretion as finder of fact with respect to the weight and credibility that attaches to the evidence. The trial court must itself determine what pertinent facts are actually established by the evidence before it, and it is not for an appellate court to determine *de novo* the weight and credibility to be given to evidence disclosed by the record on appeal.

*Phelps v. Phelps*, 337 N.C. 344, 357, 446 S.E.2d 17, 25 (1994) (citations and quotation marks omitted). Here, the trial court did not have to believe Mother's version of the

facts. The findings of fact made by the trial court are supported by competent evidence.

## V. Sister's Facilitation of Visits

¶ 40 Mother asserts the trial court "erred in finding that [her] sister did not want to facilitate visitation." (Original in all caps.) The trial court made the following pertinent finding of fact regarding Mother's sister's facilitation of Father's visitation:

> 73. The evidence clearly shows that the sister recently changed the times for the skype or phone contact unilaterally leaving the father with no choice but to accept the change or wait until he could get back into court.
>
> . . . .
>
> 77. This Court has no jurisdiction over the sister, a nonparty to this action. Consequently, the coordination with her for visitation is not appropriate.
>
> 78. Moreover, she (the sister) has already unilaterally changed the time leaving the father without recourse. He can't contact the mother otherwise and this court lacks the power to order the sister to act accordingly.
>
> 79. Moreover, at the court session on May 14, 2019, the court received information from [Father] through counsel that the sister was no longer willing to supervise the visits.

¶ 41 Mother challenges Finding of Fact 79 and argues "[t]here was no testimony that [her] sister was not willing to help with the visits" and the trial court "appears to have not only relied on arguments of [Father's] counsel to support its order, but it seems to have ignored [Mother's] counsel's response to this." She asserts that "[i]n

view of the importance of this issue of [Mother's] sister facilitating visitation, this finding was error and requires reversal."

¶ 42    However, Finding of Fact 79 was supported by evidence. At the 14 May 2019 hearing, the following exchanges occurred between Ms. Hatley and Mother's counsel, Ms. White:

> MS. HATLEY: What I can say to the Court is my client has indicated that to his knowledge nothing has changed with regard to the restraining order in New Jersey, and that the sister who had been coordinating is no longer willing to be involved in that. So that puts us kind of where I know the Court was afraid that we would --
>
> . . . .
>
> MS. WHITE: . . . . The other issue is in regards to communication between the parties. It was indicated by Attorney Hatley earlier that her client hasn't been able to talk to the child. Your Honor, my client did bring in a copy of the logs and it does show that he's had numerous phone calls.
>
> MS. HATLEY: Your Honor, that was not my representation. My representation was that the sister who was facilitating does not wish to be involved any further.
>
> MS. WHITE: Okay. And that is – that is not what is indicated from me. It's just the sister is a dentist, as we described before, and she does have specific times that she's available. And calls have still been made since that time.

¶ 43    Finding of Fact 79 finding reflects Father's counsel's statement to the court that Father "indicated that to his knowledge" "the sister who had been coordinating

is no longer willing to be involved in that." The trial court did not find as fact that Mother's sister was unwilling to supervise visits. Finding of Fact 79 is supported by evidence.

¶ 44        Moreover, it was not necessary for Mother's sister personally to come to a hearing in North Carolina and testify that she no longer wanted to facilitate visitation, as she was not a party subject to the district court's jurisdiction. The trial court had no authority to direct Mother's sister to do anything. Father presented evidence regarding his difficult experiences with attempting to facilitate visitation through Mother's sister. The sister's actions and Father's inability to exercise visitation as ordered tend to indicate that the sister was either unwilling or unavailable to facilitate visitation as needed. Even if Mother's sister had been amenable to facilitating visitation, there was no abuse of discretion in the court finding she was not appropriate for the role in light of the unchallenged findings of fact based upon Father's actual experience in attempting to coordinate visitation through Mother's sister. *See Koufman*, 330 N.C. at 97, 408 S.E.2d at 731.

## VI.    DVPO

¶ 45        Mother contends that the trial court "erroneously used the New Jersey DVPO against" her and "failed to give full faith and credit to the DVPO." (Original in all caps.) In its order entered 27 June 2019, the trial court made the following findings of fact regarding the DVPO:

25. The Defendant Mother filed for and obtained a DVPO in the State of New Jersey. A hearing was held and a permanent order was entered April 11, 2017. This order was granted and remains in effect. The New Jersey court has now directed that the visitation be as indicated by the North Carolina Court.

26. The New Jersey Court found that she moved to New Jersey around November, 2016 and did not disclose to [Father] her location.

27. This Court notes that while it is very clear that North Carolina was the Home State at the time of filing, the testimony offered here today does conflict with some of the facts found as indicated in the NJ case.

28. It is also clear that the alleged acts of physical domestic violence allegedly occurred in North Carolina. The case in fact went to the New Jersey Appellate Court and was remanded to the trial court for further orders.

29. One of the major issues on the appeal was to clarify that the act of domestic violence found was not a physical assault or physical domestic violence, but what was described as a threat. While the Defendant Mother testified as to alleged physical assault, that was not the finding of the trial court as to the reason for the DVPO.

30. The corrections were made to correct the order and the order was filed. That order has now been entered and the DVPO is a permanent one in full force and effect.

31. The DVPO order has a specific no contact provision as it relates to the father and the mother. The order was entered based upon a Facebook post on the father's Facebook page, not as a result of any actual physical violence nor any direct threat sent by the father to the mother. The Court found that even though he didn't send the item to her and she was not his friend on Facebook, the

information could find its way to her.

32. The item posted stated: "Nothing is ever forgotten, nothing is ever forgiven. Everything will be remembered, everything will be avenged."

33. The New Jersey order further indicated a section awarding temporary custody to the mother, presumably consistent with this Court's order.

. . . .

44. The New Jersey Appellate Court noted that the trial court chastised the mother for not complying with this Court's custody order. He admonished her that it was wrong to interfere with the father's visitation time.

. . . .

47. She has used the New Jersey DVPO as a means of avoiding the father having any contact with her and relegating his efforts to exercise his visitation contingent upon his contact with relatives of the mother.

. . . .

72. The mother now has a Domestic Violence Protective Order that prohibits the father from having contact with her. The Father is required to contact a non-party sister of [Mother] to facilitate the contact and the visitation.

73. The evidence clearly shows that the sister recently changed the times for the skype or phone contact unilaterally leaving the father with no choice but to accept the change or wait until he could get back into court.

74. The Mother's failure to abide by the Court's Orders coupled with the DVPO no contact order and the requirement therein that he contact a nonparty relative to

coordinate his visitation are all problematic in this case.

75. This further complicates matters in that the father cannot contact the mother to express his unhappiness and the violation of the order as he is prohibited from having contact with her.

76. This allows the ·mother to withhold and deflect reasons as to why the visitation did not occur.

77. This Court has no jurisdiction over the sister, a nonparty to this action. Consequently, the coordination with her for visitation is not appropriate.

78. Moreover, she (the sister) has already unilaterally changed the time leaving the father without recourse. He can't contact the mother otherwise and this court lacks the power to order the sister to act accordingly.

79. Moreover, at the court session on May 14, 2019, the court received information from the Plaintiff through counsel that the sister was no longer willing to supervise the visits.

80. The New Jersey court rightly determined that these parties will have to interact as a result of the minor child for the next "many, many years." The trial court further indicated the parties would have to see each other "continuously or at least come into contact" as it relates to dealing with the minor child through the years.

81. Unfortunately, the no contact provision is problematic for the Plaintiff father. It places him in a significant dilemma.

82. A fair reading could expose him to contempt and/or criminal prosecution for contacting the mother in reference to the visitation or the status of the minor child while in his care.

83. Moreover, it could be used as a spear or a shield by the defendant mother, and she has clearly demonstrated a propensity to thwart his visitation and further alienate him from the minor child.

84. Consequently, this court directed the parties, specifically the Defendant Mother, to return to the New Jersey Court to have the provision removed and/or clarified to specifically allow contact for the purposes of complying with this Court's Custody Order.

85. The Court has now determined that the no contact order remains in effect and this is a barrier to the Plaintiff Father's ability to visit with and co-parent his minor child.

86. The restraining order may provide the mother with a legal basis to thwart the father's efforts to visit with, contact, locate or otherwise have a relationship with his child.

87. The sister has now changed the time for telephone calls. The father cannot contact the mother to complain. This Court lacks jurisdiction over the sister and this is fundamentally unfair to the Plaintiff father in this matter.

. . . .

102. To be clear, the order being entered today posed a very difficult decision for the Court. It is not one the court enters lightly. Had the Defendant Mother complied with this court's orders and made the effort to accommodate the visitation with the father, the Court well likely would have placed primary custody with her. However, the use of the DVPO to essentially hide behind, the failure to foster the relationship and follow the court orders as to visitation and her repeated attempts to shift the focus to the DVPO, all led to the inescapable conclusion that she has little if any intention to foster a relationship with the father.

. . . .

104. In fact, during the entrance of the order in Court today, the Court directed the parties to disclose their addresses and contact information for purposes of facilitating contact and arrange for visitation and effectuation of the order and the Defendant Mother was reluctant to provide her email due to the New Jersey order. This clearly demonstrates the dilemma and her continued resistance.

105. The New Jersey DVPO order does provide that the visitation be as indicated by the North Carolina Court. The Court enters this order and specifically finds it is in the best interest of the minor child for the parties to have contact for the purpose of facilitating visitation and to discuss the welfare of the minor child.

. . . .

109. It is in the best interest of the minor child that the parties communicate through the Our Family Wizard mode and the cost will be borne by the Plaintiff Father.

### A. Use of DVPO Against Mother

¶ 46        Mother contends that the trial court "erroneously used the New Jersey DVPO against" her. (Original in all caps.) She argues "[t]he rationale of the District Court raises very serious public policy concerns pertaining to domestic violence" and "[i]n yet another odd twist, the District Court actually directed [her] to go back to the New Jersey proceeding to have it modified to provide for communication between the parties to accommodate visitation."

¶ 47          The order is replete with findings about the effects of the DVPO on Father's visitation. Mother asserts that Findings of Fact 47, 76, 86, and 102 are "inexplicable" because "[i]t is entirely unclear the manner in which [she] is using or abusing the DVPO to avoid visitation." However, the trial court's unchallenged findings of fact establish the harmful way that Mother utilized the DVPO to her advantage in terms of Father's visitation. *See Koufman*, 330 N.C. at 97, 408 S.E.2d at 731. Additionally, record evidence supports these findings. For example, at the 12 March 2019 hearing, Father stated that Mother filed an action on 14 November 2018 in New Jersey for divorce, support, equitable distribution, and "to have New Jersey assume jurisdiction, even after [the trial court] told her that was not appropriate." In the complaint, Mother certified that the *only* action she and Father were parties to was the domestic violence proceeding and did not direct the New Jersey court to the ongoing North Carolina proceedings. According to Father, by not alerting the New Jersey court of the trial court's visitation orders, Mother "makes every effort to keep this restraining order so that my client can't have any contact with her in place."

¶ 48          Additionally, the trial court took affirmative steps to *not* use the DVPO against Mother. At the March 12, 2019 hearing on custody, termination of post separation support, alimony, and equitable distribution, the trial court explained it "c[ould not] deal with" the no contact provision because it as was "a New Jersey issue." Accordingly, the trial court stated from the bench:

> I also indicated to them, as I've indicated in the record, that the restraining order issued in New Jersey, because of the way it is written and prohibiting contact, specifically prohibiting the plaintiff father from having contact with the defendant mother, is problematic for this Court. It potentially puts him at risk for criminal charges by simply following this order. I do not believe that was the intent of the New Jersey court, but I cannot glean that, or how they would interpret it, from a reading of the order. Consequently, it will be incumbent upon the parties to file an appropriate matter in the New Jersey court to get the no-contact order lifted or to be advised that it is this Court's intention to allow contact between the parties for the purposes of visitation and the best interest of the minor child as this Court does in the usual domestic orders. So they can either remove that provision or place some clarifying language so that it will be clear that to the extent the parties have contact with regard to following this order that the Court will enter they will not be in violation or he will not be in violation of the restraining order.

¶ 49    The court continued the hearing for the limited purpose of allowing the parties to seek clarification of the order, specifically finding that it "will enter judgment as to the issue of child custody on May 14, 2019 and hopes to have clarification with regard to the provisions of the New Jersey order which prohibit any contact between these parties by that date." Mother apparently failed to take any action as anticipated as the basis for the continuance. At the 14 May 2019 hearing, Mother's counsel stated, "I don't have a status on whether a court date has been scheduled." Thus, despite the court's directives, Mother took no action.

¶ 50    Moreover, the North Carolina custody order is not inconsistent with the DVPO

and does not lessen Mother's protection. The DVPO provided that Father was to text Mother's sister "regarding parenting time only" and also provided that "[p]arenting will be the same as scheduled in North Carolina order. Pick up/drop off at Old Bridge, P.D." (Original in all caps.) The North Carolina order would necessarily allow the parents to communicate as needed for the visits to happen, particularly where the parties do not live in the same state. The only method of communication identified by the New Jersey DVPO was mother's sister, and the evidence before the trial court indicated that Mother's sister was no longer willing or available to facilitate visitation. Thus, since Mother's sister could no longer be the intermediary for communications, the trial court ordered for the parties to communicate through Our Family Wizard at Father's expense.

¶ 51        Use of Our Family Wizard to facilitate and document communications between Mother and Father is entirely consistent with the Amended DVPO. Our Family Wizard is an online application which provides tools to facilitate communications between parents, including a message board and calendar. Our Family Wizard does not require the parents to communicate directly with one another but provides a secure platform to share messages, and the messages cannot be edited or deleted after they are sent, thus providing a record for the court, if needed. Use of Our Family Wizard for coordination with Father provides Mother a far more secure method of communication with Father than using her sister as a go-between. This argument is

without merit.

**B. Failure to give Full Faith and Credit to DVPO**

¶ 52        Mother argues that "[i]n addition to using the New Jersey DVPO against [her], the lower court also failed to honor that order. The court, in effect, modified the terms of the DVPO, and further distorted the facts that led to the DVPO. In doing so the lower court failed to give full faith and credit to the DVPO as required by federal law."

¶ 53        The Full Faith and Credit Clause "requires that the judgment of the court of one state must be given the same effect in a sister state that it has in the state where it was rendered." *State of New York v. Paugh*, 135 N.C. App. 434, 439, 521 S.E.2d 475, 478 (1999) (citation omitted). "We review *de novo* the issue of whether a trial court has properly extended full faith and credit to a foreign judgment." *Marlin Leasing Corp. v. Essa*, 263 N.C. App. 498, 502, 823 S.E.2d 659, 662-63 (2019).

¶ 54        Here, the trial court did not modify the DVPO, and the custody order does not alter the effect of the DVPO. The DVPO specifically deferred to the trial court's custody order by explicitly stating, "parenting will be the same as scheduled in North Carolina order." (Original in all caps.) There is no evidence that the trial court failed to honor the DVPO; indeed, as discussed above, the trial court accommodated the restrictions of the DVPO by ordering communications through Our Family Wizard after Mother's sister was no longer available to facilitate communications. The trial court was not required to give the parties opportunities to seek modification of the no

contact provisions of the New Jersey DVPO, but the trial court did give them this opportunity. As the parties failed to take advantage of this opportunity, the trial court ordered communications through Our Family Wizard. Father is still not allowed to contact Mother directly, as required by the DVPO.

## VII. Exclusion of Mother's Exhibit

Finally, Mother contends the trial court erred by not admitting screenshots of Skype calls allegedly between her sister and Father because the "[s]creenshots are admissible, and it is not necessary that the account holder authenticate the screen."

Mother is correct that screenshots *can* be admissible evidence, but this evidence still must be authenticated. At the 11 March hearing, Mother sought to introduce what she described as "a scribe between [Father] and my sister" into evidence. Father objected and the trial court allowed his motion to strike the evidence. In the record before this Court, Mother has included the screenshots of Skype calls she sought to present as evidence. However, the *only* information provided to the trial court as to the authentication of the exhibit was Mother's statement that it was "a scribe between [Father] and my sister."

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen. Stat. § 8C-1, Rule 901(a) (2019). North Carolina Rule of Evidence 901 provides various methods to authenticate

evidence, including "[t]estimony that a matter is what it is claimed to be." N.C. Gen. Stat. § 8C-1, Rule 901(b)(1).

¶ 58 On appeal, Mother argues the screenshots "should have been admitted" because they "were crucial to show the communication between the child and her father" and Father "had introduced similar screenshots."[5] We note that the admission of Father's "similar screenshots" is not relevant to whether Mother's evidence should be admitted. We must assume that Father's evidence was either properly authenticated or Mother failed to object to admission of his evidence; there is no issue on appeal as to his evidence. However, beyond Mother's description of the screenshots as "a scribe between [Father] and my sister[,]" Mother presented no "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* Based upon Mother's own statement, she was not a party to the alleged screenshots and her only knowledge of the information needed to authenticate the screenshots would have come only from her sister, who was not present to testify. Mother did not properly authenticate the screenshots and the trial court did not err by sustaining Father's objection to admission of this evidence. *Cf.*

---

[5] We also note that even if the trial court had admitted Mother's exhibit, the trial court would still determine the weight and credibility of the evidence. *See Phelps*, 337 N.C. at 357, 446 S.E.2d at 25. Based upon our review of the proposed exhibit, admission of Mother's proposed screenshots would likely not change the trial court's analysis of the facts. The communications between the parties were clearly fraught with difficulty, based on the evidence presented by both parties.

*State v. Gray*, 234 N.C. App. 197, 206, 758 S.E.2d 699, 705 (2014) ("We hold the testimony in this case by Detective Snowden, who recovered the text messages from Mr. Diaz's cell phone, and Ms. McKoy, with whom Mr. Diaz was communicating in the text messages illustrated in exhibit twelve, was sufficient to authenticate [photographs of the text messages].").  As a result, the trial court did not err in excluding the screenshot of the skype calls.

## VIII.    Conclusion

For the reasons discussed above, we affirm the trial court's order.

AFFIRMED.

Judges ARROWOOD and HAMPSON concur.